

**DEPARTMENT OF THE NAVY**
OFFICE OF EQUAL EMPLOYMENT OPPORTUNITY
614 SICARD STREET SE SUITE 100
WASHINGTON NAVY YARD, D.C. 20374-5072

# EXHIBIT D

**CARRIE THOMAS,**
**Complainant**

**v.**

**THOMAS W. HARKER,**
**Acting Secretary,**
**U.S. Department of the Navy**

**DON No. 20-30270-01839**

## FINAL AGENCY DECISION – MIXED CASE

**February 22, 2021**

## STATEMENT OF CLAIM

Complainant alleged that the Agency subjected her to discrimination on the basis of disability (mental impairment) when, on October 1, 2019, she was placed on indefinite suspension without pay.

## PROCEDURAL HISTORY

On March 15, 2019, Complainant requested Equal Employment Opportunity (EEO) counseling. The EEO Counselor sought to resolve Complainant's allegations to no avail. IF, p. 1406. On June 3, 2019, the EEO Counselor issued a Notice of Final Interview/Right to File a Formal Complaint of Discrimination. IF, p. 001423. Complainant filed a formal complaint (DON No. 19-30270-01944) on June 19, 2019, pursuant to the Rehabilitation Act of 1973 (Rehabilitation Act), as amended, which was partially accepted on August 9, 2019. IF, pp. 0001430-0001432. Complainant amended her Complaint on October 25, 2019 to include the instant complaint.  By letter dated May 1, 2020, the Department of the Navy (Agency) accepted the amended complaint pursuant to the Equal Employment Opportunity Commission's (EEOC's) Regulations found in Title 29 Code of Federal Regulations (29 C.F.R.) Part 1614. IF, pp. 000019-000020.  Through this letter, the Agency advised that the matter at issue in the request to amend is properly processed as a "mixed case" complaint, explaining that a "mixed case" complaint is a discrimination complaint filed with a federal agency alleging discrimination based on race, color, religion, sex, national origin, age, disability, genetic information or reprisal for protected EEO activity, that is related to or stemming from an action that may be appealed to the Merit Systems Protection Board (MSPB). Accordingly, the Agency bifurcated the claims and processed the underlying claim under DON No. 20-30270-01839. The Agency further advised that upon conclusion of the formal investigation, we would issue a final decision based on the merits of this complaint along with notice of right to appeal to the MSPB.

The Department of Defense, Investigations and Resolutions Directorate conducted a formal investigation of this complaint from May 6, 2020 to July 31, 2020. IF, p. 000043. Agency records reveal that we provided Complainant a copy of the Investigative File (IF) on August 7, 2020. IF, p. 001316. As this complaint constitutes a "mixed case," we once again advised Complainant that the MSPB has jurisdiction over an allegation of discrimination related to a matter appealable to the MSPB and that the Agency will issue a final agency decision (FAD) with appeal rights to the MSPB.

Accordingly, we are issuing this final decision based on the merits of the complaint pursuant to 29 C.F.R. § 1614.302.

## BACKGROUND

During the relevant period, Complainant was employed as a Business Financial Manager, NH-0501-IV, with the Agency's NAVSEA since October 19, 2014. Complainant's first-line supervisor was RMO1, Director, Contracts and Business Operations, Surface Ship Weapons, PEO, IWS, 3E, since March 22, 2017.  Complainant's second-line supervisor was RMO2, Deputy Major Program Manager (DMPM) PEO, IWS, 3, since approximately March 22, 2017. According to Complainant's medical records and her own statements, her disabling medical conditions include Major Depression Disorder, General Anxiety Disorder and Obsessive-Compulsive Disorder; she also suffers from symptoms associated with Attention Deficit Disorder and Gastrointestinal conditions.  IF, pp. 000053-000075. Complainant averred that RMO1 and RMO2 were the Agency officials responsible for discriminating against her. IF, p. 000064.

The record reveals that on May 10, 2019, Complainant received a Notice of Intent to Suspend Access to Classified Information and Assignment to a Sensitive Position and Suspension of Physical Access to Naval Sea Systems Headquarters Facilities at the Washington Navy Yard (Notice).  IF, p. 359-363. The Notice identified the following reasons for its issuance:

a. Documented workplace conduct of habitual tardiness and absences, lack of candor regarding tardy incidents and absences, and failure to appropriately document absences from the workplace, which resulted in disciplinary action.[1]

b. Self-described mental health illnesses, to include psychiatric disorders, depression disorder, anxiety (repeated exclamations of living in or consumed with fear), opioid use/withdrawal, stress, attention deficit disorder, problems with concentration or memory, time management issues, and suicidal ideations (repeated exclamations like "no desire to continue living like this").

---

[1] We note that matters specifically addressing Complainant's conduct and subsequent disciplinary actions are being adjudicated under the bifurcated complaint, DON No. 19-30270-01944, through which she alleged the disciplinary actions in dispute were the result of discrimination based on disability and reprisal.  Any references to said matters herein serve as background information only.

c. Medical documentation of treatment for a number of mental health disorders to include receiving frequent and continuous treatment and medication to manage condition, to include obsessive-compulsive disorder, generalized anxiety disorder, major depression disorder, attention deficit hyperactivity disorder, and suicidal ideations (repeated exclamations like "I can't live like this any longer").

d. Documented prescribed medications for treatment of mental health issues with unknown side/causal effects, and failure to take prescription medications as prescribed. You provided numerous prescription labels with a wide variety of potential side/causal effects, but no documentation of whether you are suffering any side/causal effects of these prescribed medications. You recently notified my office that you have stopped taking prescribed medications for your mental health conditions on your own initiative against the advice of your medical providers.

e. Documented display of erratic behavior and emotional swings while in the workplace.

IF, pp. 000359-000360.

The Notice also indicated Complainant's failure to report her mental health illnesses and the changes in her mental health illnesses to security prior to April 2019 as additional reasons for issuance. The Notice specifically referenced reported incidences of suicidal ideations, Complainant's conduct and subsequent disciplinary action, the scope of self-described mental health conditions, scope of documented mental health conditions, the amount of prescribed medicines for mental health conditions with unknown side/causal effects, the non-adherence to prescribed medications, and Complainant's workplace behavior, impacted and raised questions about Complainant's ability to protect classified information and continued suitability for security clearance eligibility. The Notice further indicated that Complainant's suicidal ideations raised concerns as to the threat she may pose to herself or others. The Notice stated that Personal Conduct, Drug Involvement, and Psychological Conditions are three of the adjudicative factors criteria underlying references (a) and (b). Finally, the Notice informed Complainant that if the final determination regarding her access to information was not favorable, the temporary suspension would remain in effect pending final adjudication by the Department of Defense Consolidated Adjudication Facility (DoD CAF).  Complainant was provided the opportunity to provide a response, which she did in writing and was accepted as timely by the NAVSEA Security Office.  IF, pp. 000259-000361.

On May 10, 2019, Complainant was also notified via letter that she was being placed on paid administrative leave for the reasons explained in the Notice, and informed that administrative leave was found to be appropriate to the circumstances. IF, pp. 000355-000357. The letter also referred to a reference (a), entitled, "SECNAVINST 12752.lA, Disciplinary Actions, of 3 May 6, 2016, with change transmittal CH-1 of 6 Nov 2017".  IF, pp. 0001555-000157.

Through a letter dated July 15, 2019, Complainant was notified of the decision to Suspend Access to Classified Information and Assignment to a Sensitive Position and Suspension of Physical Access to Naval Sea Systems Headquarters Facilities at the Washington Navy Yard. The letter informed Complainant of the determination that her response to the Notice did not mitigate the command's concerns regarding her ability to safeguard classified information and continued assignment to a sensitive position.  IF, pp. 000155-000157.

On August 8, 2019, RMO1 issued Complainant Notice of Proposed Indefinite Suspension for failure to maintain a condition of employment; specifically, failing to maintain access to classified information and assignment to sensitive position.  IF, pp. 000174-000180.

On September 30, 2019, RMO2 notified Complainant of his Decision to Indefinitely Suspend Access to Classified Information and Physical Access to her workplace and the Washington Navy Yard.  Through this Decision, RMO2 notified Complainant that she was being placed on indefinite suspension for "failure to meet a condition of employment, i.e., suspension of your access to classified information and assignment to a sensitive position." The Notice, informed that Complainant was to be on suspension until her Secret Security Clearance is either reinstated or until the final decision is made to revoke her Clearance. IF, pp. 000189-000199.

## STATEMENT OF FACTS

As background information, Complainant reports that on December 4, 2018, she had a meeting with RMO2 regarding her request for accommodations, during which she disclosed her disorders while explaining why she required accommodations; SEC1, head of IWS3 Security was in attendance. IF, p. 000065. She adds that on March 5, 2019, 99 days after her original formal request for accommodation was submitted, she received a 10-page document from RMO1 requesting additional medical information from her doctors before a decision could be made on the request.  IF, p. 000066.

Complainant averred that when she received the letter suspending her access to classified information and assignment to a sensitive position, she was told that the documentation she had submitted in response did not mitigate the three issues as stated in the letter.  She questioned why she was not asked for clarification of the "inconsistencies and contradictions" that allegedly did not mitigate the Command's concerns regarding her ability to safeguard classified information. Complainant contended that after many requests, she was never told why her medical documentation did not meet the mitigating factors. Complainant argued that RMO2 could have reassigned her to a position that did not require a security clearance, yet he chose not to. Complainant asserted her belief that RMO2 confused a lack of policy with the inability or willingness to do what he must have known was the right thing.  She stated that when she requested to be sent to a new command, RMO2 responded with words to the effect, "How can I tell another code, I've got this great employee, who can't manage to get to work on time. I can't put you off on someone else like that."  IF, pp. 000051-000056.

Complaint averred that had the Agency accommodated her disabilities, she would not have received any punitive letters or disciplinary actions, and thus the Agency would not have

4

initiated the process resulting in her being placed on Indefinite Unpaid Leave.[2] She further maintained that she was unaware that she should have been sharing information about changes to her medical conditions with NAVSEA Security.  She also purported that she was never provided any proof supporting the allegation that she abused drugs.  Complainant adds that she requested reassignment while she was on paid administrative leave and her request was denied. IF, pp. 000058-000062.

**Management's Response**

**RMO1** (no disability), Principal Assistant Program Manager/Director, Contracts and Business Operations, PEO IWS, Surface Ship Weapons (3.0) NAVSEA, Arlington, Virginia, stated her first-line supervisor was RMO2, Deputy Program Manager. RMO1 denied Complainant was discriminated against due to her disability when she was placed on indefinite suspension without pay. She averred the action was taken because Complainant did not maintain a condition of employment, as she failed to maintain access to classified information and assignment to a sensitive position; issuance of a Notice of Decision to Suspend her Clearance by NAVSEA Security followed on July 15, 2019.  RMO1 declared she was not involved in the NAVSEA decision process. RMO1 contended Complainant was well aware of requirements to report any mental health changes or issues to Security, having been informed in several ways (e.g., via 1-on-1 meetings wherein RMO1 maintained she told Complainant to self-identify any changes, Annual Security refresher training conducted by SEA00P, as well as through Total Workforce Management Services (TWMS) which all employees are required to take).  RMO1 further relayed that that Complainant acknowledged awareness of requirements to report to Security. RMO1 confirmed Complainant had identified a list of other NAVSEA Commands to which she would consider moving, even at a lower pay grade, but maintained such a move was dependent on the review of her security clearance for all identified Commands.  IF, pp. 000266-000282.

**RMO2** (no disability), Deputy Program Manager, PEO IWS 3.0, US Navy, Arlington, VA, denied Complainant was discriminated against; stressing that his decision to indefinitely suspend Complainant was based on her inability to obtain and maintain a SECRET security clearance. He maintained he is not aware of what specific instances NAVSEA Security considered in making their decision to revoke Complainant's security access beyond what is written in RMO3's Notice of Decision to Suspend Access to Classified Information. RMO2 stated he did not forward information to DoD CAF or the PSAB regarding Complainant, and declared he is not aware of who submitted a list of medications Complainant was taking and her psychiatrist's letter(s), or who determined Complainant's drug involvement was a problem.  RMO2 contended he has no knowledge of the documentation regarding Complainant's inappropriate drug involvement that adversely impacted her ability to retain her access to classified information and to retain a sensitive position or how she deviated from the approved medical direction of her doctor.   RMO2 maintained he is not aware of Complainant's psychological conditions that adversely impacted her ability to retain her access to classified information or to retain a sensitive position. RMO2 testified he was not involved in the Security team's decision to revoke

---

[2] Complainant provided a timeline of events that detailed her continued efforts beginning April 27, 2017 to obtain accommodations for her disabilities while under RMO1's supervision.  This timeline includes dates on which she was issued the various disciplinary actions at issue in her formal complaint (DON 20-30270-01944) from which the instant complaint was bifurcated.

Complainant's security access. RMO2 declared he is not aware of anyone who has had their security clearance suspended indefinitely and kept in a pay status while their suspended clearance was with DoD CAF or the PSAB.  RMO2 averred he was aware Complainant had identified a list of other NAVSEA Commands to which she would consider moving, but reassignment was not an option because of her security posture. IF, pp. 000286-000291.

**RMO3** (disability not disclosed), Director of Security Programs, NAVSEA, Washington Navy Yard, Washington, DC, declared Complainant's indefinite suspension was a matter for Complainant's supervisory chain of command and as such, he was not involved and made no recommendations.   He averred that SECNAV M-5510.30 and Security Executive Agent Directive 4 were followed in making his decision to suspend Complainant's access to a sensitive position and to NAVSEA buildings.  RMO3 maintained the decision to suspend Complainant's access to classified information and assignment to a sensitive position was made after consideration of the totality of reported activity and concerns delineated in the Notice of Intent to Suspend Access to Classified Information and Assignment to a Sensitive Position and Suspension of Physical Access to Naval Sea Systems Headquarters Facilities at the Washington Navy Yard, District of Columbia, and Program Executive Office Facilities in Arlington Virginia ("Notice of Intent to Suspend"). Specifically, he averred Complainant's reported incidences of suicidal ideations, her conduct and subsequent disciplinary action, the scope of her self-described mental health conditions, the scope of documented mental health conditions, the amount of prescribed medicines for mental health conditions with unknown side/causal effects, the non-adherence to prescribed medications, and her workplace behavior, raised questions about her ability to protect classified information and continued suitability for security clearance eligibility. He contended that the Notice of Intent to Suspend further indicated Complainant's suicidal ideations raised concerns as to the threat she may pose to self or others. RMO3 maintained, in response to the Notice of Intent to Suspend, Complainant stated, "I can understand, based on the information you were provided, why there may have been a concern and therefore, a need to contact me about these issues. It is my most sincere apologies that I overlooked submitting this vital information to security…Again, I fully understand what was done, and can appreciate why the command felt it necessary." RMO3 stated the medical documentation Complaiant provided did not mitigate concerns regarding her ability to safeguard classified information and assignment to a sensitive position; he did not consider it. Rather, the matter was referred to the DoD CAF for competent medical/psychological assessment and adjudication.  RMO3 states Complainant's disability was not taken into consideration when the decision was made to suspend her security clearance and access to the NAVSEA buildings.  IF, pp. 000291-000302.

**RMO4** (no disability), Employee Relations Specialist, Labor-Employee Relations, NAVSEA, Washington Navy Yard, Washington, DC, stated he assisted RMO1 with drafting the proposed indefinite suspension, and RMO2 in preparing the decision on the proposed suspension.  He relayed that a search was not conducted to ascertain if a non-sensitive position was available for which Complainant was qualified that would have kept her on the payroll until her security clearance was adjudicated since DON has no official policy requiring such. He explained that every employee is kept on payroll while their clearances are being adjudicated unless their clearance has been suspended or revoked, as in this case, at which time they are put in an indefinite suspension without pay status pending the outcome of the adjudication process. He maintained he is not aware of anyone being kept in a pay status while their clearance was being

adjudicated by DoD CAF or PSAB.  RMO4 stated NAVSEA is responsible for determining whether an employee's medical documentation, submitted from a physician/psychiatrist, warrants suspension of the employee's ability to access classified information and assignment to a sensitive position and suspension of physical access to NAVSEA HQ facilities. IF, pp. 000310-000313.

SEC (no disability) NH-0343-03, PEO IWS 3.0, Chief of Staff and Assistant Security Manager, NAVSEA, Arlington, VA, averred she has been employed by NAVSEA for 9.5 years; 2010-2017 as a support contractor and since August 2015 as a government civilian. She averred she became aware Complainant claimed she had a disability in a meeting on April 9, 2019. In response to whether Complainant had been reported as being suicidal, having mood swings, and/or other claims, she states that RMO1 reported her concerns about Complainant to RMO3 and his team on April 5, 2019, and she was subsequently copied on the email. SEC averred she was not involved in the decision to suspend access to Complainant and to her knowledge, Complainant was not at any time subjected to harassment and/or discriminated against based on her disabilities. IF, pp. 000139-000141.

**Documentary Evidence**

Included in the record evidence is an unsigned declaration purported by Complainant to be written by **CW1 (disability unknown, EEO activity unknown),** IWS 3E, alleging the following:

> On Monday, September 17, 2018, at approximately [7:00am], [RMO1] came over to my desk. She had just finished talking to one of the government employees on her staff for approximately three hours. [RMO1] proceeded to "vent" to me about her employee, beginning with the fact that she was "finally able to get rid of her after three hours." I knew a bit about the employee, given that I had been assigned to cover her "Cost of Funds" (CoF) efforts while she was out. The email that I included with this report contains the comment that [RMO1] made regarding the employee seeking "treatment"; so I already knew that detail about the employee. [RMO1] essentially spent about 30 minutes or so complaining to me about the employee, her poor performance and a few of the accommodations that she wanted (which [RMO1] said she declined), the fact that she came back from therapy "happy and well-behaved" but that now she was "relapsing," and that she "doesn't belong here." She also told me that the employee was on two medications that apparently did not go well together; so that when she was on one her other ailment was an issue, and vice versa. She told me a little about the employee's history in the Air Force, and that a family member had been suicidal, and that she was given a position over here, but that it wasn't working out. [RMO1] further said that she thought the employee should find something else, but that she did not have a lot of flexibility because

7

her husband was unemployed. [RMO1] commented that the employee's husband needed to "get off his ass and find a job." Given the very personal nature of the information, especially the medical information, I was very uncomfortable being the recipient of RMO1's "venting". The employee knows that I know some things, as the email was part of the package that I initially sent her to let her know what I had done with respect to the CoF effort thus far. So, she has the offending email; and she has spoken to me about it, so she knows that I know more. I am writing this report to make sure that this event is recorded. I have reason to distrust [RMO1] regarding this incident; and I want to make sure that I provide my chain of command with the details as soon as possible. I also have every reason to believe that [RMO1] will retaliate against me in some way for this report, or if she knew that her employee had spoken to me.

IF, p. 001380.

The record evidence includes an email from RMO1 to CW1 dated July 19, 2018, discussing tasks that CW1 had taken over while Complainant was on leave. IF, pp. 000390-000391. Specifically, RMO1 stated in her email to CW1, "I've been trying to get my gov't employee to complete a task, any task, but I've been struggling ….. [I] [j]ust didn't have an opportunity to break the cord until the employee decided to seek treatment for three weeks, but now I do." IF, p. 000064.

As set forth above, the record also includes the September 30, 2019, Notice of Decision to Indefinitely Suspend, issued (by direction) by RMO2; the August 8, 2019, Notice placing Complainant on paid administrative Leave, issued by RMO1; and the May 10, 2019, Notice of Intent to Indefinitely Suspend Access to Classified information and Assignment to a Sensitive Position and Suspension of physical access, issued by RMO1. IF, pp. 000330-000332, 000353-000355, 000357-000360.

Complainant's written reply to the Notice of Intent to Indefinitely Suspend Access to Classified information and Assignment to a Sensitive Position and Suspension of physical access, issued to Complainant on May 10, 2019 by RMO1 is located at IF, pp. 000362-000364.

Included in the record evidence is a copy of DoD manual 5200.02, Procedures For the DoD Personnel Security Program (PSP) (April 3, 2017). The following sections relevant to the investigation include the following:

Section 11.3. ADDITIONAL REPORTING REQUIREMENTS FOR INDIVIDUALS WITH ACCESS TO SCI INFORMATION.

Individuals with access to SCI information will comply with reporting requirements identified in Volume 3 of DoDM 5105.21.

8

Section 11.5. POST-ADJUDICATION ISSUES.

Upon receipt of a report of adverse information from any source, an adjudicator will evaluate the report and determine whether post-adjudicative actions are required. If the adjudicator's review determines the reported information is not adequate or detailed enough to make an eligibility determination, the adjudicator may employ authorized means (e.g., requests for special investigations, interrogatories, contacts with subjects and employers, requests for information from security professionals, requests for medical or psychological evaluation, and record searches) to obtain additional information to make an eligibility determination. IF, p. 000724.

The record also includes statements from Complainant's physicians confirming her diagnoses of the following conditions on or around August 1, 2018: Major Depressive Disorder, General Anxiety Disorder, Panic Disorder, and Obsessive Compulsive Disorder, Cervical radiculopathy, cervical spondylosis, and cericalgia. One physician's statement was submitted as part of a request for extended leave under the Family Medical Leave Act (FMLA) due to a sufficiently severe diagnosis of Major Depressive Disorder, General Anxiety Disorder, and Obsessive Compulsive Disorder, which required treatment in a hospital setting (Partial Hospital Program (PHP)) because Complainant at that time was unable to concentrate and focus due to a psychiatric condition. The PHP occurred five days a week for six hours a day. IF, pp. 000423, 000445, 001390-001398.

The record includes medical documentation dated January 3, 2015, wherein Complainant was diagnosed with Adjustment disorder with Mixed Anxiety and Depressed Mood, and incontinence. IF, p. 000455.

The record evidence contains several performance appraisals issued to Complainant by her supervisors, effective January 1, 2017, issued by Complainant's supervisor, that shows she met or exceeded the expected performance level required by the Agency. IF, p. 001528.

Included in the record is a signed copy of Complainant's Physician's statement on letterhead of one of Complainant's physicians (DCT), addressed to NAVSEA Security office, Human Resources, and "anyone else with a need-to-know", transmitted via fax to the appropriate management officials on May 28, 2019. The statement included a detailed overview of Complainant's current psychiatric medications and side-effects, current diagnoses and symptoms of mental illnesses, and suggested appropriate reasonable accommodations. Through this document, DCT also strongly emphasized the following to the Security Office:

I would like to dispel several items [Complainant] has shared with me, as alleged by her employer:

- She has never shown any signs of being suicidal, or having ideations of suicide.

9

- She has never shown any signs of being aggressive, irrational, nor a harm to herself or others around her. …
- I would not consider her a threat to any type of security protocol(s), her co-workers, nor her country. …
- I've seen the effort [Complainant] is willing to put into her treatment (and has accomplished in the past), provided the proper environment, tools, medication, and therapy, she has a high probability of success.

IF, p. 001794.

## LEGAL ANALYSIS

### Applicable Law

The Rehabilitation Act prohibits employment discrimination against federal employees with disabilities. 42 U.S.C. § 12112(a) (2012). The Rehabilitation Act incorporates the standards of the ADA Amendments Act (ADAAA) of 2008. These standards prohibit discrimination *against a qualified individual on the basis of disability*. § 12112(a).

An indefinite suspension lasting more than 14 days is an adverse action appealable to the Merit Systems Protection Board (MSPB) under 5 U.S.C. § 7513(d). 5 U.S.C. § 7512(2). Generally, the Board may only review: (1) whether the employee's position required a security clearance; (2) whether the clearance was denied or revoked; and (3) whether the employee was provided with the procedural protections specified in 5 U.S.C. § 7513. See, Hesse v. Department of State, 217 F.3d 1372, 1376 (Fed. Cir. 2000) (citing Department of the Navy v. Egan, 484 U.S. 518, 530-31 (1988)).

Here, Complainant maintains her indefinite suspension was the direct result of the Agency's engagement in the prohibited personnel practice of disability discrimination.

**Disparate Treatment**

A claim of disparate treatment is examined under the three-part analysis first enunciated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). For a complainant to prevail, he/she must first establish a *prima facie* case of discrimination by presenting facts that, if unexplained, reasonably give rise to an inference of discrimination, i.e., that a prohibited consideration was a factor in the adverse employment action. See McDonnell Douglas, 411 U.S. at 802; Furnco Construction Corp. v. Waters, 438 U.S. 567 (1978). The burden then shifts to the agency to articulate a legitimate, nondiscriminatory reason for its actions. See Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). Once the agency has met its burden, the complainant bears the ultimate responsibility to persuade the fact finder by a preponderance of the evidence that the agency acted on the basis of a prohibited reason. See St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).

*Prima Facie*

In order to establish a *prima facie* case of disparate treatment, a complainant must generally show (1) membership in a protected class, (2) an employment situation comparable to that of other employees not of the same protected class, and (3) treatment that is different than that experienced by those other employees with respect to the terms, conditions, or benefits of employment.  McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273 (1976); Scott v. Secretary of Defense, EEOC Appeal No. 01902727 (September 24, 1990).

Employees are in comparable employment situations when it is reasonable to believe that they would receive the same treatment in the context of a particular employment decision.  See, Lindemann & Grossman, Employment Discrimination Law, 3rd Ed., Chapter 2, pp. 30-33 (1996). In order for comparative employees to be considered similarly situated, all relevant aspects of the complainant's situation must be nearly identical to those of the comparative employees.  O'Neal v. Postmaster General, EEOC Request No. 05910490 (July 23, 1991); Powell v. Postmaster General, EEOC Appeal No. 01911979 (November 25, 1991).   Thus, in order to be similarly situated, the comparative employees must have dealt with the same supervisor and have been subject to the same standards.  Mitchell v. Toledo Hospital, 964 F.2d 577 (6th Cir. 1992).

Even in cases where there are no similarly situated employees, a complainant may be able to establish a *prima facie* case by showing: (1) membership in a protected class, (2) the occurrence of an adverse employment action, and (3) some evidence of a causal relationship between membership in the protected class and the adverse action.  Ward v. U.S. Postal Service, EEOC Request No. 05920219 (June 11, 1992), citing Potter v. Goodwill Industries of Cleveland, 518 F.2d 864, FEP Cases (6th Cir. 1975) and Leftwich v. United States Steel Corporation, 470 F. Supp. 758 (W.D. Pa. 1979).

*Management Response*

If a *prima facie* case is established, the burden shifts to the agency to articulate a legitimate, nondiscriminatory reason for the challenged action.  McDonnell, 411 U.S. at 802; Burdine, 450 U.S. at 253-54.  The agency's burden is met by simply proffering evidence that raises a genuine issue of fact as to whether it retaliated against the complainant.   This is not a burden of persuasion, but rather a burden of production to "clearly set forth, through the introduction of admissible evidence, the reasons for [its employment decision]."  Burdine, 450 U.S. at 254-55. Evidence of a legitimate, nondiscriminatory reason must be sufficient to allow the trier of fact rationally to conclude that the agency's action was not based on unlawful discrimination. Nguyen v. Gen. Servs. Admin., EEOC Appeal No. 0120101852, 3 (Sept. 28, 2011).  This burden is not onerous, but must "provide a specific, clear, and individualized explanation."  Kathy D. v. Dep't of Labor, EEOC Appeal No. 0120141643, 2 (July 19, 2016).

*Pretext*

Once the agency produces evidence of a legitimate, nondiscriminatory reason, the presumption raised by the *prima facie* case disappears, and the agency will prevail unless the complainant

proves, by a preponderance of the evidence, that the legitimate reasons articulated by the agency were not its true reasons but were, instead, a pretext for discrimination. St. Mary's, 509 U.S. at 519; Burdine, 450 U.S. at 256. To prove a reason is pretext for retaliation, a complainant must show that the reason was false, and that retaliation was the real reason. St. Mary's, 509 U.S. at 515.   Therefore, the fact finder must both disbelieve the employer's articulated reason and believe complainant's explanation that unlawful retaliatory animus motivated the agency's actions. St. Mary's, 509 U.S. at 519. To prove pretext, it is not enough to simply disagree with the agency's actions. Alexandria P. v. U.S. Postal Serv., EEOC Appeal No. 0120150286, 4 (Oct. 20, 2015). EEO laws "cannot prevent employers from making decisions that their employees disagree with, unless those decisions are rooted in a statutorily proscribed motivation." Emilia Z., EEOC Appeal No. 0120142952 at 3. Additionally, mere assertions, speculations, unsupported beliefs, or conclusory answers are not enough to establish pretext. Complainant v. Dep't of Homeland Sec., EEOC Appeal No. 01020133401, 3 (May 7, 2015); Complainant v. Dep't of Agric., EEOC Appeal No. 0120130270, 3 (Sept. 18, 2015).

## Analysis

To sustain an indefinite suspension, the Agency must show: (1) it imposed the suspension for an authorized reason; (2) the suspension has an ascertainable end, *i.e.*, a determinable condition subsequent that will bring the suspension to a conclusion; (3) the suspension bears a nexus to the efficiency of the service; and (4) the penalty is reasonable. Sanchez v. Department of Energy, 117 M.S.P.R. 155, ¶ 9 (2011).

Here, Complainant generally maintains that the suspension at issue was based on her mental disability; arguing that had the Agency provided her reasonable accommodations, there would have been no reason to review her eligibility to maintain the security clearance required for her position.   Thus, Complainant asserts that the Agency imposed the suspension based on discriminatory animus based on her disability.

### *Element 1: Did the Agency impose the suspension for an authorized reason?*

Pursuant to 5 U.S.C. § 7701(c)(2)(B), the agency's decision may not be sustained if the employee or applicant for employment shows that the decision was based on any prohibited personnel practice described in section 2302(b) of this title, which prohibits personnel actions that discriminate based on disability, among other protected bases.   Thus, as an initial matter, we must determine whether Complainant establishes that she was subjected to disability discrimination.

Disparate Treatment based on Disability:

To establish a *prima facie* case of disability discrimination under a disparate treatment and/or a failure to accommodate theory, Complainant must demonstrate that: 1) she is an "individual with a disability" as defined in 29 C.F.R. § 1630.2(g); 2) she is a "qualified individual with a disability" as defined in 29 C.F.R. § 1630.2(m); and (3) she was subjected to an adverse personnel action under circumstances giving rise to an inference of disability discrimination

and/or denied a reasonable accommodation. See <u>Prewitt v. United States Postal Service</u>, 662 F.2d 292 (Cir. 1981).

Element 1:  Individual with a Disability?

In order to assert a viable claim of disability discrimination, a complainant must satisfy the threshold requirements that he or she is a "person with a disability" as that term is defined in the applicable statutes and Equal Employment Opportunity Commission regulations. Title 42, United States Code, Section 12102(1) and 29 C.F.R. §1630.2(g)(1) define a person with a disability as an individual who: (i) has a physical or mental impairment which substantially limits one or more of that person's major life activities (referred to elsewhere in the regulations as "actual disability"); (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment. <u>See</u> 29 C.F.R. § 1630.2(g)(1)-(3). See also <u>Melahn v. Department of the Navy</u>, EEOC Appeal No. 01832380 (October 21, 1985).  Whether an individual has a disability is not based on the name or diagnosis of the impairment involved but rather the effect which that impairment has on the individual.

A physical or mental impairment is defined as: (1) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or (2) any mental or psychological disorder, such as an intellectual disability,  organic brain syndrome, emotional or mental illness, and specific learning disabilities. 29 C.F.R. § 1630.2(h).

The impairment must substantially limit the complainant, or significantly restrict him or her as to the condition, manner, or duration under which he performs a particular major life activity as compared with the performance of the average person in the general population. See 29 C.F.R. § 1630.2(j)(1)(ii). Major life activities include, but are not limited to, such functions as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. § 1630.2(i)(1)(i). Major life activities also include the operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. 42 U.S.C. §12102(2)(B) and 29 C.F.R. § 1630.2(i)(1)(ii).

The Americans with Disabilities Act Amendments Act of 2008 (ADAAA) and its implementing regulations create nine "Rules of Construction" to be applied to determine whether or not an impairment is substantially limiting.  42 U.S.C. §12102(4) and 29 C.F.R. §1630.2(j)(1).  Besides calling for broad and consistent coverage and an "individualized assessment", the rules provide that an impairment is disabling if it substantially limits an individual's ability to perform a major life activity in comparison to "most people in the general population."   In making this comparison, the regulations call for consideration of the difficulty, effort, or time required by the individual to perform the major life activity; the length of time the activity can be performed; the way in which the major life activity is affected by the impairment involved; and the non-ameliorative effects of mitigating measures such as the side effects of medication.  See 29 C.F.R.

§1630.2(j)(4).  This regulation also makes clear that the focus should be on the effort required not the outcome that can be achieved by the individual with the impairment.

In addition, an impairment need only affect one major life activity to be substantially limiting; an impairment need not "significantly restrict" in order to be substantially limiting; and a determination concerning the application of the term should not require "extensive analysis" and not usually require scientific, medical, or statistical analysis.  The rules also state that episodic impairments or those in remission can be substantially limiting if they would be so when they are active and that even conditions which have less than a six-month duration could be substantially limiting.  Significantly, the Commission states in its regulations that the application of these rules of construction to certain medical conditions will "… in virtually all cases, result in a determination of coverage…" when assessing a possible "actual disability" (as distinguished from a "regarded as" disabled) situation.  See 29 C.F.R. §1630.2(j)(3), Predictable Assessments.

The ADAAA eliminated consideration of the ameliorative effects of mitigating measures when determining whether or not an impairment is substantially limiting except for consideration of ordinary eyeglasses or contact lenses intended to correct visual acuity or eliminate refractive error.  Mitigating measures include medication; medical supplies, equipment, or appliances; assistive technologies; low vision devices; hearing aids and implants; mobility devices; oxygen therapy equipment and supplies; prosthetics; and "reasonable accommodations or auxiliary aids or services", e.g. interpreters or readers or the modification of equipment.  See 42 U.S.C. §12102(4)(E) and §12103 and 29 C.F.R. §1630.2(j)(5) and (6).

A generalized assertion, without specific evidence to support it, that an individual is substantially limited is not sufficient to satisfy a complainant's burden of proof. Jenkins v. U.S. Postal Service, EEOC Appeal No. 01954572 (March 24, 1997).  It is also not enough that the agency is in possession of a diagnosis; that an individual's supervisor knows that they have a particular condition; that the complainant has an approved claim with the Office of Workers Compensation Programs; or that the complainant has a percentage disability awarded by the Department of Veterans Affairs.  Black v. U.S. Postal Service, EEOC Request No. 05930748 (May 12, 1994); Pascale v. Department of the Navy, EEOC Petition No. 03850092 (March 5, 1986); Schnabele v. U.S. Postal Service, EEOC Appeal No. 01982634 (July 13, 2001); and Bono v. U.S. Postal Service, EEOC Appeal No. 01951113 (August 11, 1997).

In the instant case, Complainant's physician statements show that on or before August 1, 2018, she had been diagnosed with Major Depressive Disorder, General Anxiety Disorder, Panic Disorder, and Obsessive Compulsive Disorder, Cervical radiculopathy, cervical spondylosis, and cericalgia.  IF, pp. 000425, 000447. The record further shows that on January 3, 2015, Complainant was diagnosed with Adjustment disorder with Mixed Anxiety and Depressed Mood, and incontinence. IF, p. 000457.  The EEOC regulations conclude that Major Depressive Disorder substantially limits the major life activity of brain function. 29 C.F.R. § 1630.2(3)(ii-iii) ("Given their inherent nature, these types of impairments will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity. Therefore, with respect to these types of impairments, the necessary individualized assessment should be particularly simple and straightforward").

Also included in the record is a signed copy of Complainant's Physician's statement that included a detailed overview of Complainant's current psychiatric medications and side-effects, current diagnoses and symptoms of mental illnesses, and suggested appropriate reasonable accommodations.

The Agency does not dispute awareness of Complainant's disabilities or that Complainant was regarded as disabled.  In fact, one of the reasons offered for the ultimate revocation of Complainant's security clearance was her failure to inform Security of, and apprise of changes in her mental status.  Thus, the record supports a determination that Complainant was deemed an individual with a disability during the period at issue.

Element 2: Qualified Individual with a Disability?

The next element of a *prima facie* case of disability discrimination is to establish that the Complainant is "a qualified individual"—that is, someone with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. 42 U.S.C. §12111(8). Specifically, the regulations define a "qualified individual" as a person who satisfies the requisite skill, experience, educational, and other job-related requirements of the position the individual holds or desires and who, with or without reasonable accommodation, can perform the essential functions of that position without endangering the health and safety of the individual or others. 29 C.F.R. §1630.2(m). "Accordingly, a [complainant] must show either that he can perform the essential functions of his job without accommodation, or, failing that … that he can perform the essential functions of his job with a reasonable accommodation." D'Angelo v. Conagra Foods, Inc., 422 F.3d at 1229 (quotation marks omitted). See also 29 C.F.R. § 1630.2(o)(1)(ii) ("The term reasonable accommodation means:… Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position…"). "If the individual is unable to perform an essential function of his job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under [the Rehabilitation Act]."

The essential functions of a position are the fundamental job duties of the position the complainant holds or desires considering whether the position exists to perform the function, whether there are a limited number of individuals available to perform the function, or whether the function is highly specialized and the incumbent was hired for his expertise. 29 C.F.R. §1630.2(n). The Complainant has the burden of proving that he is a "qualified individual." Jasany v. Postmaster General, 755 F.2d 1244 (6th Cir. 1985). The complainant must also show that the agency was aware of the allegedly disabling condition and that a plausible accommodation can be made. Mikovich v. U.S. Postal Service, EEOC Appeal No. 01A11150 (June 20, 2002).

Here, Complainant's position required a SECRET level security clearance, for which it was determined she was no longer qualified to hold based on misconduct, reported suicidal ideations, failure to report mental disability and changes in the status of her disabilities to the Security Office, failing to follow her prescribed medication regimen, and drug use/abuse.

As such, we find that Complainant's inability to retain her security clearance deemed her unable to perform the essential functions of her job, even with reasonable accommodation. Thus Complainant fails to satisfy the second element of her *prima facie* case of disability discrimination.

Element 3: Adverse Treatment?

It is well established that imposition of an indefinite suspension based on an inability to retain a security clearance is deemed an adverse personnel action reviewable by the MSPB. Therefore, Complainant has established the third element of her *prima facie* case.

However, as Complainant failed to satisfy element 2, she fails to establish a *prima facie* case of disability discrimination.

We recognize that Complainant's burden to establish a *prima facie* case is not onerous. Whether or not a complainant has established a *prima facie* case, where management has provided a legitimate, nondiscriminatory explanation for its action, the factual inquiry must proceed to a decision on the ultimate factual issue in the case -- i.e., whether management's actions were discriminatory within the meaning of [the Rehabilitation Act]. See U.S. Postal Board of Governors v. Aikens, 460 U.S. 711, 713-714 (1983); Hernandez v. Department of Transportation, EEOC Request No. 05900159 (June 28, 1990). Thus, we continue our analysis despite the deficiencies in Complainant's *prima facie* evidence.

*Management Response*

As set forth above, management officials credibly relayed that the proposed suspension and removal of access was based on a variety of concerns with Complainant's conduct and fitness to retain her security clearance. RMO1 relayed Complainant's behavior indicated defective judgement and reliability on a regular basis, which ultimately le[d] to progressive disciplinary actions on record. Upon issuance the proposal to indefinitely suspend, Complainant was appropriately placed on administrative leave with pay until the Agency determined to issue its final decision to place her on indefinite suspension without pay for failure to meet a condition of employment; specifically, suspension of Complainant's access to classified information and assignment to a sensitive position. Thus the record supports a determination that the Agency offered legitimate, nondiscriminatory reasons for its actions.

The burden now returns to Complainant to show that the rationale provided was offered as mere pretext to mask true discriminatory animus based on disability.

*Pretext*

Once the agency produces evidence of a legitimate, nondiscriminatory reason, the presumption raised by the *prima facie* case disappears, and the agency will prevail unless the complainant proves, by a preponderance of the evidence, that the legitimate reasons articulated by the agency were not its true reasons but were, instead, a pretext for discrimination. St. Mary's, 509 U.S. at 519; Burdine, 450 U.S. at 256; Pavelka v. Dep't of the Navy, EEOC Request No. 05950351, 3

(Dec. 14, 1995). To prove a reason is pretext for discrimination, a complainant must show that the reason was false, and that discrimination was the real reason. St. Mary's, 509 U.S. at 515. Therefore, the fact finder must both disbelieve the employer's articulated reason and believe complainant's explanation that unlawful discriminatory animus motivated the agency's actions. St. Mary's, 509 U.S. at 519. To prove pretext, it is not enough to simply disagree with the agency's actions. Alexandria P. v. U.S. Postal Serv., EEOC Appeal No. 0120150286, 4 (Oct. 20, 2015). EEO laws "cannot prevent employers from making decisions that their employees disagree with, unless those decisions are rooted in a statutorily proscribed motivation." Emilia Z., EEOC Appeal No. 0120142952 at 3. Additionally, mere assertions, speculations, unsupported beliefs, or conclusory answers are not enough to establish pretext. Complainant v. Dep't of Homeland Sec., EEOC Appeal No. 01020133401, 3 (May 7, 2015); Complainant v. Dep't of Agric., EEOC Appeal No. 0120130270, 3 (Sept. 18, 2015).

Here, Complainant provided a signed declaration in rebuttal. IF, p. 1135-1169. Through this document, Complainant continued to argue that the misconduct cited as a factor leading to the indefinite suspension would not have occurred had she been granted the requested reasonable accommodation. Complainant insisted that RMO1 used the information she provided her about her illness to punish her by subjecting her to a variety of disciplinary actions and reporting negative things about her to NAVSEA Security, which ultimately led to the indefinite suspension.

Complainant asserted that RMO1 was "the one providing all this negative information about Complainant" to Security and was the ultimate authority on reporting this negative information about her, despite her medical documentation provided to RMO1 by DCT to the contrary. IF, p. 1140. Finally, Complainant averred that after all the negative information RMO1 provided to HR and Security, she got what she wanted as stated in her email 'to break the cord' when Complainant was issued the Notice of Unpaid Indefinite Suspension. She also relayed that she told RMO1 that she spoke to a Crisis line (which is also a suicide hotline) for help with a mental illness crisis she was going through, not because she was suicidal. Complainant admitted that she told RMO1 that she felt unsafe due to the hostile work she was experiencing under RMO1's supervision, but declared that she had never been suicidal. IF, p. 1155.

Complainant went on to argue that the Agency's decision to initiate the review of her security clearance was prompted by unlawful retaliation for participating in protected activities (requesting reasonable accommodations) under the Rehabilitation Act – RMO1's actions were directly related to her desire to "cut the cord" with Complainant. IF, p. 1158.

We acknowledge that RMO1 engaged in less than professional behavior as management official by discussing Complainant's personal information with a contractor and specifically indicating that she wanted to "cut the cord" with Complainant. In fact, although RMO1 averred that what she meant by "break the cord" was to take a particular assignment away from Complainant and indicated that she apologized to Complainant, the Agency appropriately addressed RMO1's behavior. IF, p. 1877. Specifically, RMO2 relayed that he conducted a thorough investigation into Complainant's report of the incident and found it to be credible; working with HR, RMO1 was charged for inappropriate behavior and was issued a formal Letter of Reprimand dated Oct 30, 2018.

Notwithstanding, we find RMO1's report of Complainant's misconduct and behavior to the Security office was motivated by lawful factors. The record shows that Complainant admitted to making statements such as feeling unsafe in the work environment and "not wanting to live like this anymore." A reasonable person, hearing those comments, may have been motivated in good faith to report their concerns about Complainant's behavior to the Agency's Security division to ascertain whether the comments rose to the level requiring reinvestigation of their Security clearance and/or subsequent suspension of access to classified materials and physical worksite access. The additional incidents of concern were also reasonably raised and found to support the personnel action in dispute. Complainant's allegation that the Agency failed to reasonably accommodate her disabilities is not reviewable under this venue. However, we find that even if the Agency granted her reasonable accommodations and said accommodations alleviated the circumstances leading to Complainant's cited misconduct and subsequent disciplinary actions, the remaining factors cited more than warranted the initiation of a review of Complainant's security clearance.

Based on the above, we find that Complainant failed to prove that management actions were discriminatory in nature. Rather, the evidence supports a finding that the Agency imposed the indefinite suspension for an authorized reason – Complainant failed to satisfy a condition of employment, as the security clearance required for her position was revoked and the Agency decision was pending review with the DOD CAF.

### Element 2: Did the suspension have an ascertainable end?

The September 30, 2019, Decision to Indefinitely Suspend Access to Classified Information and Physical Access to her workplace and the Washington Navy Yard, clearly notified Complainant that she was being placed on indefinite suspension for "failure to meet a condition of employment, i.e., suspension of your access to classified information and assignment to a sensitive position." The Notice also informed Complainant she was to be on suspension until her Secret Security Clearance is either reinstated or until the final decision is made [by DoD CAF] to revoke her Clearance. IF, pp. 000189-000199.

Thus, the indefinite suspension had a condition subsequent that would bring it to an end.

### Element 3: Does the suspension bear a nexus to the efficiency of the service?
### Element 4: Is the penalty reasonable?

As Complainant could no longer perform her duties and the Agency determined that there were no other positions to which she could be reassigned while her eligibility for her security clearance was pending before the DOD CAF, for the efficiency of service, the Agency was not required to continue her employment in a paid status.

It is well settled that an agency may indefinitely suspend an employee when access to classified information has been suspended and the employee needs such access to perform his or her job. *See* Rogers v. Department of Defense, 122 M.S.P.R. 671, ¶ 5.

Here, there is no dispute that Complainant's position required access to classified information, which was revoked pending final review of the specific circumstances surrounding the revocation, including an appropriate review of her medical documentation by qualified reviewing authorities.  Moreover, the record clearly reveals that Complainant was provided with the procedural protections specified in 5 U.S.C. § 7513. *See id.*, ¶ 5, as well as the procedural protections required under the Agency's own regulations pursuant to 5 U.S.C. § 7701(c)(2)(A).  See <u>Palafox v. Department of Navy</u>, 2016 M.S.P.B. 43. Specifically, upon issuance of the proposed indefinite suspension, Complainant was provided an opportunity to respond to the proposal; she responded and provided additional medical documentation. The Deciding Official deemed her statement and documentation insufficient to allay the suspension decision; determined that there were no positions to which she could be reassigned while her clearance was revoked, and issued the Decision to Indefinitely Suspend pending review of the DOD CAF.

Based on a review of the evidence in its entirety, we find that management offered legitimate nondiscriminatory reasons for its actions, that the decision to indefinitely suspend Complainant followed appropriate policy and regulatory procedures, and Complainant was appropriately afforded due process.  Absent evidence of discrimination, it is not the role of the fact finder to sit as a "super-personnel department that reexamines an entity's business decisions."  <u>Fischbach v. D.C. Dept. of Corrections</u>, 86 F.3d 1180 (D.C. Cir. 1996).  We decline to do so here.

### DECISION

Accordingly, we find that the Department of the Navy did not discriminate against Complainant based on disability as alleged.

### NOTICE OF RIGHTS

This is the final decision of the Department of the Navy on Complainant's complaint of discrimination.  If Complainant is dissatisfied with this decision, detailed appeal rights are below.

### RIGHT TO GO TO THE MSPB

In accordance with 29 C.F.R. § 1614.302(d), Complainant may file a Notice of Appeal with the Merit Systems Protection Board (MSPB) at any time up to thirty calendar days after receipt of this decision.

In response to the ongoing coronavirus pandemic (COVID-19), the MSPB encourages the use of e-Appeal Online.  Visit MSPB e-Appeal Online at https://e-appeal.mspb.gov.

If Complainant plans to file a new appeal by paper, Complainant should know in advance that MSPB will be unable to docket and adjudicate the appeal if it is filed on paper during the ongoing coronavirus pandemic.  Paper submissions will not be received by MSPB for the foreseeable future.

If Complainant chooses to file an appeal by paper, the Notice of Appeal should be addressed to:

**Merit Systems Protection Board**
**1615 M Street, NW**
**Washington, DC 20419**

At the same time Complainant provides information to MSPB she MUST send a copy of the submission to the appropriate servicing EEO Office.  Refer to the Certificate of Service attached to this decision for that address.

Service upon the Department of the Navy of any statement or brief in support of Complainant's appeal is mandatory.  In or attached to the appeal to the MSPB, Complainant must certify the date and method by which service was made on this Office.

An appeal shall be deemed filed on the day it is postmarked, or, in the absence of postmark, on the date it is received by the Merit Systems Protection Board.  A copy of the MSPB Appeal Form 185 is enclosed.

## <u>RIGHT TO GO TO FEDERAL COURT</u>

In accordance with 29 C.F.R. § 1614.310, Complainant may file a civil action in an appropriate U.S. District Court:

- Within 30 calendar days of receipt of this decision unless an appeal is filed with the Merit Systems Protection Board in accordance with the procedures above; or

- Within 30 calendar days of receipt of notice of the final decision or action taken by the Merit Systems Protection Board, if Complainant does not file a petition for consideration with the Equal Employment Opportunity Commission; or

- Within 30 calendar days of receipt of notice that the Equal Employment Opportunity Commission has determined not to consider the decision of the Merit Systems Protection Board; or

- Within 30 calendar days of receipt of notice that the Equal Employment Opportunity Commission concurs in the decision of the Merit Systems Protection Board; or

- If the Equal Employment Opportunity Commission issues a decision different from the decision of the Merit Systems Protection Board, within 30 calendar days of receipt of the notice that the Merit Systems Protection Board concurs in and adopts in whole the decision of the Equal Employment Opportunity Commission; or

- If the Merit Systems Protection Board does not concur with the decision of the Equal Employment Opportunity Commission and reaffirms its initial decision or reaffirms its

initial decision with a revision, within 30 calendar days of receipt of notice of the decision of the Special Panel; or

- After 120 calendar days from the date of filing a formal complaint if there is no final action or appeal to the Merit Systems Protection Board; or

- After 120 calendar days from the date of filing an appeal with the Merit Systems Protection Board if the Merit Systems Protection Board has not yet made a decision; or

- After 180 calendar days from the date of filing a petition for consideration with the Equal Employment Opportunity Commission, if there is no decision by the Commission, reconsideration decision by the Merit Systems Protection Board, or decision by the Special Panel.

Federal courts are individually coordinating with state and local health officials to obtain local information about the COVID-19) pandemic and some have issued orders relating to court business, operating status, and public and employee safety.

**Please visit the following U.S. District Courts website to access information posted to local district court's websites regarding COVID-19 and court business:**

**https://www.uscourts.gov/about-federal-courts/court-website-links/court-orders-and-updates-during-covid19-pandemic#district.**

<u>Special Deadline for Age Discrimination Suits</u>.  As to any claim based on the Age Discrimination in Employment Act of 1967 (29 U.S.C. 633a), not only must Complainant file suit within 90 days of receipt of this decision, Complainant <u>MAY</u> only have <u>SIX YEARS FROM THE DATE OF THE ALLEGED DISCRIMINATION TO FILE</u> allegations of age discrimination in a lawsuit.  <u>See</u> *Lehman v. Nakshian*, 453 U.S. 156 (1981); 29 U.S.C. 633a(f); and 28 U.S.C. 2401.  Filing an appeal to the Commission will not stop that time from running.  If the time limit is close to expiring, Complainant should consider whether or not Complainant wishes to file a civil suit.  Complainant may be barred from filing such a suit, should he or she allow the time limit to expire, even if he or she has an appeal in process with the Commission.

<u>Proper Defendant</u>.  If Complainant files a lawsuit, Complainant must sue the Secretary of the Navy by name and title.  Presently, the proper defendant is, "Thomas W. Harker, Acting Secretary of the Navy."  Failure to list Mr. Harker's name and his title may result in the dismissal of Complainant's case.  Rule 25(d)(2), Federal Rules of Civil Procedure.  Do not sue Complainant's supervisor, Complainant's unit, Complainant's base commanders, or the Department of the Navy.

## <u>RIGHT TO COUNSEL</u>

If Complainant chooses to file a lawsuit and does not have an attorney or is unable to obtain one, Complainant may request the court for help locating attorney representation.  The clerk's office of the nearest U.S. District Court is the best place to contact in order to find out if the court can

help Complainant locate an attorney.  If Complainant cannot afford an attorney, the clerk's office will explain how to request the court to appoint attorney representation without payment of any fees or costs.

If Complainant needs this kind of help, Complainant should contact the court as soon as possible, but no later than ninety days from the date Complainant receives this decision.  <u>THE U.S. DISTRICT COURT WILL NOT COMPLAINANT'S DEADLINE TO FILE SUIT WHILE COMPLAINANT ATTEMPTS TO GET AN ATTORNEY.  IF COMPLAINANT IS GOING TO FILE A LAWSUIT, COMPLAINANT MUST DO SO WITHIN THE APPROPRIATE TIME LIMIT WITH OR WITHOUT AN ATTORNEY</u>.

DEANNER P. WHITE
Complaints Program Manager

Enclosure:
MSPB Appeal Form 185
EEOC COVID-19 Notice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the Agency sent the final action in the discrimination case of **CARRIE THOMAS v. THOMAS W. HARKER, ACTING SECRETARY OF THE NAVY**, **Case No. DON 20-30270-01839**, to the following parties on the date cited below:

*Via Department of Defense (DoD) Secure Access File Exchange (SAFE):*

**<u>COMPLAINANT</u>**
Carrie Thomas
145 N Vail Drive
Madison Heights, VA 24572
(202) 603-8239
plomeeke@gmail.com

*Via electronic mail:*

**<u>SERVICING EEO OFFICE</u>**
HQ, Deputy EEO Officer (SEA 10E)
1339 Patterson Ave SE
Portsmouth, VA 23709
NAVSEAHQEEO.fct@navy.mil

**<u>AGENCY REPRESENTATIVE</u>**
Steven Lippman
1333 Isaac Hull Ave SE
Washington Navy Yard, DC 20376
steven.lippman@navy.mil

For timeliness purposes, we presume that the parties received this notice within five calendar days after issuance:


Date: <u>February 22, 2021</u>              _Deanner P. White_____

                                         Deanner P. White
                                         Department of the Navy
                                         Office of Equal Employment Opportunity
                                         614 Sicard Street SE, Suite 100
                                         Washington Navy Yard, DC  20374-5072

**FAD Key**

| | |
|---|---|
| RMO1 | Sarah Campbell, Director, Contracts and Business Operations |
| RMO2 | Kirk Johnson, Deputy Major Program Manager |
| RMO3 | John Segura, 0080, Director of Security Programs |
| RMO4 | Norman Ellis, 0201-03, Employee Relations Specialist |
| CW1 | Michael Hoskinson, Complainant's former coworker |
| CW2 | Christian Johnson, Complainant's former coworker |
| SEC | Lisa Foote, head of IWS3 Security |
| DCT | Randolph A. Frank, Jr., M.D., Complainant's Psychiatrist |